# EXHIBIT A

# 2013-2014
# JOINT LEGISLATIVE ECONOMIC DEVELOPMENT AND GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE



## REPORT TO THE 2013-2014
## GENERAL ASSEMBLY OF NORTH CAROLINA
## 2014 SESSION

A LIMITED NUMBER OF COPIES OF THIS REPORT IS AVAILABLE
FOR DISTRIBUTION THROUGH THE LEGISLATIVE LIBRARY

ROOM 500
LEGISLATIVE OFFICE BUILDING
RALEIGH, NORTH CAROLINA 27603-5925
TELEPHONE: (919) 733-9390

THE REPORT IS AVAILABLE ON-LINE:
http://www.ncleg.net/LegLibrary/

THE REPORT AND ALL MEETING MATERIALS ARE ALSO AVAILABLE ON-LINE AT THE
COMMITTEE'S WEBSITE: http://ncleg.net/gascripts/Committees/Committees.asp

# TABLE OF CONTENTS

Letter of Transmittal.................................................................................................... i

Joint Legislative Economic Development and Global Engagement
Oversight Committee Membership ................................................................. ii

Preface............................................................................................................................1

Committee Proceedings .............................................................................................3

Committee Recommendations and Legislative Proposals ...................................4

    1.  NC Economic Development Partnership Modifications…….....................................6

    2.  Patent Abuse Bill ……………….................................................................30

# Appendices*

A.   Authorizing Legislation, Article 12O of Chapter 120  of the  General Statutes
B.   Meeting Agendas

---

*All of the  meeting handouts, including Power Point presentations, may  be accessed  online in PDF format
at the Committee website:  http://ncleg.net/gascripts/Committees/Committees.asp



# JOINT LEGISLATIVE ECONOMIC DEVELOPMENT AND GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE

### State Legislative Building
### Raleigh, North Carolina    27603

*Senator Harry Brown, Cochair*                    *Representative Tom Murry, Cochair*

# April 3, 2014

**TO THE MEMBERS OF THE 2014 GENERAL ASSEMBLY:**

The Joint Legislative Economic Development and Global Engagement Oversight Committee submits to you for your consideration its report pursuant to G.S. 120-70.130.

Respectfully Submitted,

Sen. Harry Brown, Co-Chair                    Rep. Tom Murry, Co-Chair

i

2013-2014

# JOINT LEGISLATIVE ECONOMIC DEVELOPMENT AND GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE

## MEMBERSHIP

Senator Harry Brown, Cochair        Rep. Tom Murry, Cochair

Senator Tamara Barringer            Rep. John Bell (Advisory)
Senator Angela Bryant               Rep. Mark Brody (Advisory)
Senator Rick Gunn                   Rep. Brian Brown (Advisory)
Senator Neal Hunt                   Rep. Rick Catlin
Senator Brent Jackson               Rep. Jeff Collins
Senator Clark Jenkins               Rep. Debra Conrad
Senator Gene McLaurin               Rep. Ted Davis
Senator Floyd McKissick, Jr. (Advisory)   Rep. Susi Hamilton
Senator Wesley Meredith             Rep. Edward Hanes
Senator Bob Rucho                   Rep. Charles Jeter (Advisory)
Senator Norman Sanderson            Rep. Susan Martin
                                    Rep. Chris Millis (Advisory)
                                    Rep. Tim Moffitt
                                    Rep. Rodney Moore
                                    Rep. Michele Presnell (Advisory)
                                    Rep. Andy Wells

Staff:

Elise McDowell, Committee Clerk
Regina Irwin, Committee Clerk
Cindy Avrette, Staff Attorney
Trina Griffin, Staff Attorney
Rodney Bizzell, Fiscal Analyst
Aubrey Incorvaia, Fiscal Analyst
Patrick McHugh, Fiscal Analyst
Dan Ettefagh, Staff Attorney
Gayle Moses, Staff Attorney

ii

# PREFACE

The Joint Legislative Economic Development and Global Engagement Oversight Committee is established in Article 12O of Chapter 120 of the General Statutes to serve as a permanent legislative commission to review issues relating to economic growth and development in the global economy. The Committee consists of twenty-two members and seven advisory members. The co-chairs for 2013-2014 are Senator Harry Brown and Representative Tom Murry.

The General Assembly created the Joint Select Economic Development Oversight Committee in 2003 based upon a recommendation of the Joint Select Committee on Economic Growth and Development to provide a standing study committee on the issue of economic development oversight. However, the committee went several years without members. Members were appointed for the first time in the fall of 2010 and met once in January 2011.

Since 2003, the General Assembly created two other committees in the area of economic development that influenced the purpose and scope of this Committee. In 2007, Senator Basnight and Speaker Hackney created a *Joint Select Committee on Economic Development Incentives*. That Committee contracted with the UNC Center for Competitive Economies and began the process of analyzing the effectiveness of the economic development programs supported by the State. One of the recommendations of the UNC Center report was to institute a legislative oversight function specifically to establish priorities for and assess performance of State and regional economic development agencies. This Committee can provide this legislative oversight function. In 2009, Senator Basnight and Speaker Hackney created the *Joint Select Committee on Global Engagement*. That Committee held meetings across the State and heard from parties interested in global economic development. At the recommendation of that Committee, the General Assembly expanded the scope of the 2003 Joint Legislative

1

Economic Development Oversight Committee to include global business opportunities.

In its study of the economic development and global engagement issues, G. S. 120-70.131 gives the Committee a very broad scope, stating that the Committee "shall examine economic development and global engagement issues and strategies in North Carolina in order to make ongoing recommendations to the General Assembly on ways to promote cost-effective economic initiatives, economic growth, and stimulating job creation in the global economy." A copy of Article 12O of Chapter 120 of the General Statutes is included in Appendix A. A committee notebook containing the Committee minutes and all information presented to the Committee is filed in the Legislative Library and may also be accessed online at the Committee's website: http://ncleg.net/gascripts/Committees/Committees.asp.

# COMMITTEE PROCEEDINGS

The Joint Legislative Economic Development and Global Engagement Oversight Committee met six times after the adjournment of the 2013 Regular Session of the General Assembly on July, 26 2013. The Committee received regular updates from the Department of Commerce regarding implementation of the newly created Rural Economic Development Division and preparation for the public private partnership, also known as the Economic Development Partnership of North Carolina, Inc., as authorized by the Appropriations Act of 2013 (S.L. 2013-360, as amended by S.L. 2013-363). Other topics addressed include:

- North Carolina's competitive outlook;
- Economic impact of the 2012 Biggert-Waters Flood Insurance Reform Act;
- Targeting job creation in areas with high unemployment;
- Best practices for public private partnerships; and
- Innovation.

Appendix B contains a copy of the Committee's agenda for each meeting. All of the materials distributed at the meetings may be viewed on the Committee's website.[2]

---

[2] North Carolina General Assembly - Joint Legislative Economic Development and Global Engagement Oversight Committee

# COMMITTEE RECOMMENDATIONS
# AND LEGISLATIVE PROPOSALS

The Joint Legislative Economic Development and Global Engagement Oversight Committee recommends to the 2014 Regular Session of the 2013 General Assembly the following:

- NC Economic Development Partnership Modifications

- Patent Abuse Bill

4

# LEGISLATIVE PROPOSALS

**(THIS IS A DRAFT AND IS NOT READY FOR INTRODUCTION)**
4/2/2014 8:42:51 AM

| | | |
|---|---|---|
| Short Title: | NC Econ. Dev. Partnership Modifications. | (Public) |
| Sponsors: | Representative Murry./Senator Brown (Primary Sponsor). | |
| Referred to: | | |

1    A BILL TO BE ENTITLED
2 AN ACT TO FACILITATE ECONOMIC DEVELOPMENT WITHIN THE STATE.
3 The General Assembly of North Carolina enacts:
4
5 **PART I. AUTHORIZE CONTRACTING OF ECONOMIC DEVELOPMENT**
6 **FUNCTIONS BY THE DEPARTMENT OF COMMERCE**
7     **SECTION 1.1.(a)** Part 1 of Article 10 of Chapter 143B of the General Statutes is
8 amended by adding a new section to read:
9 "**§ 143B-431A. Department of Commerce – contracting of functions.**
10     (a)    Purpose. – The purpose of this section is to establish a framework whereby the
11 Department of Commerce may support through financial and other means a nonprofit
12 corporation that will render advisory, research, and recruiting recommendations regarding
13 incentives or grant awards for fostering and retaining jobs and business development,
14 marketing, and consultation in the development of a comprehensive, long-range strategic plan
15 for economic development through public and private means. It is the intent of the General
16 Assembly that the Department develops a plan to work cooperatively with a nonprofit
17 corporation for these purposes while safeguarding programmatic transparency and
18 accountability as well as the fiscal integrity of economic development programs of the State.
19     (b)    Contract. – The Department of Commerce is authorized to contract with a North
20 Carolina nonprofit corporation to perform one or more of the Department's functions, powers,
21 duties, and obligations set forth in G.S. 143B-431, except as provided in this subsection. If the
22 Department contracts with a North Carolina nonprofit corporation to promote and grow the
23 travel and tourism industries, then all funds appropriated to the Department for tourism
24 marketing purposes shall be used for a research-based comprehensive marketing program
25 directed toward consumers in key markets most likely to travel to North Carolina and not for
26 ancillary activities, such as statewide branding and business development marketing. The
27 Department may not contract with a North Carolina nonprofit corporation regarding any of the
28 following:
29         (1)    The obligation or commitment of funds under this Article, such as the One
30             North Carolina Fund, the Job Development Investment Grant Program, the
31             Industrial Development Fund, or the Job Maintenance and Capital
32             Development Fund.
33         (2)    The Division of Employment Security, including the administration of
34             unemployment insurance.

6

Case 5:23-cv-00493-FL   Document 47-12   Filed 01/02/24   Page 13 of 57

| | (3) | The functions set forth in G.S. 143B-431(a)(2). |
| | (4) | The administration of funds or grants received from the federal government or its agencies. |

(c)     Oversight. -- There is established the Economic Development Accountability & Standards Committee, which is a Board as that term is defined in G.S. 138A-3 of the State Government Ethics Act. The Committee shall consist of seven members as follows: the Secretary of Commerce as Chair of the Committee, the Secretary of Transportation, the Secretary of Environment and Natural Resources, the Secretary of Revenue, one member appointed by the Speaker of the House of Representatives, one member appointed by the President Pro Tempore of the Senate, and one member jointly appointed by the Speaker of the House of Representatives and the President Pro Tempore of the Senate.

    The members of the Committee who are appointed by the Speaker of the House of Representatives or by the President Pro Tempore of the Senate may not be members of the General Assembly. The Committee shall meet at least quarterly upon the call of the chair. The duties of the Committee shall include all of the following:

| | (1) | Monitoring and oversight of the performance of a contract entered into pursuant to this section by the Department with a North Carolina nonprofit corporation. |
| | (2) | Receiving, reviewing, and referring complaints regarding the contract or the performance of the North Carolina nonprofit corporation, as appropriate. |
| | (3) | Requesting enforcement of the contract by the Attorney General or the Department. |
| | (4) | Auditing, at least biennially, either by use of the State Auditor or internal auditors of the Department, of the records of the North Carolina nonprofit corporation with which the Department has contracted pursuant to this section during and after the term of the contract to verify data affecting performance and reports. |
| | (5) | Coordination of economic development grant programs of the State between the Department of Commerce, the Department of Transportation, and the Department of Environment and Natural Resources. |
| | (6) | Any other duties deemed necessary by the Committee. |

(d)     Limitations. -- Prior to contracting with a North Carolina nonprofit corporation pursuant to this section and in order for the North Carolina nonprofit corporation to receive State funds, the following conditions shall be met:

| | (1) | At least 45 days prior to entering into or amending in a nontechnical manner a contract authorized by this section, the Department shall submit the contract or amendment, along with a detailed explanation of the contract or amendment, to the Joint Legislative Commission on Governmental Operations and the Fiscal Research Division. |
| | (2) | The nonprofit corporation adheres to the following governance provisions related to its governing board: |
| | | a.     The board shall be composed of 17 voting members as follows: eight members and the chair appointed by the Governor, four members appointed by the Speaker of the House of Representatives, and four members appointed by the President Pro Tempore of the Senate. The Governor, the Speaker of the House of Representatives, and the President Pro Tempore of the Senate shall each select members so as to reflect the diversity of the State's geography, and each member appointed by the Governor shall have expertise in one or more of the following areas: |

7

1. Agribusiness, as recommended by the Commissioner of Agriculture.
2. Financial services.
3. Information technology.
4. Biotechnology or life sciences.
5. Energy.
6. Manufacturing.
7. Military or defense.
8. Tourism, as jointly recommended by the North Carolina Travel and Tourism Coalition and the North Carolina Travel Industry Association.
9. Retail, distribution, and logistics.

b. No member of the board may take any official action or use the member's official position to profit in any manner the board member's immediate family, a business with which the board member or the board member's immediate family has a business association, or a client of the board member or the board member's immediate family with whom the board member, or the board member's immediate family, has an existing business relationship for matters before the board. No board member shall attempt to profit from a proposed project of the Department if the profit is greater than that which would be realized by other persons living in the area where the project is located. If the profit under this sub-subdivision would be greater for the board member than other persons living in the area where the project is located, not only shall the member abstain from voting on that issue, but once the conflict of interest is apparent, the member shall not discuss the project with any other board member or other officer or employee of the Department except to state that a conflict of interest exists. Under this sub-subdivision, a board member is presumed to profit if the profit would be realized by a board member's immediate family, a business with which the board member or the board member's immediate family has a business association, or a client of the board member or the board member's immediate family with whom the board member, or the board member's immediate family, has an existing business relationship for matters before the board. No board member, in contemplation of official action by the board member, by the board, or in reliance on information that was made known to the board member in the board member's official capacity and that has not been made public, shall (i) acquire a pecuniary interest in any property, transaction, or enterprise or gain any pecuniary benefit that may be affected by such information or official action or (ii) intentionally aid another to do any of the above acts. As used in this sub-subdivision, the following terms mean:

1. Board. – The governing board of the nonprofit corporation with which the Department contracts pursuant to this section.
2. Board member. – A member of the board.
3. Business association. – A director, employee, officer, or partner of a business entity, or owner of more than ten percent (10%) interest in any business entity.
4. Department. – The Department of Commerce.

8

5.  Immediate family. – Spouse, children, parents, brothers, and sisters.

6.  Official action. – Actions taken while a board member related to or in connection with the person's duties as a board member, including, but not limited to, voting on matters before the board, proposing or objecting to proposals for economic development actions by the Department or the board, discussing economic development matters with other board members or Department staff or employees in an effort to further the matter after the conflict of interest has been discovered, or taking actions in the course and scope of the position as a board member and actions leading to or resulting in profit.

7.  Profit. – Receive monetary or economic gain or benefit, including an increase in value whether or not recognized by sale or trade.

c.  No State officer or employee may serve on the board.

d.  The board shall meet at least quarterly at the call of its chair. Each quarter and upon request, the board shall report to the Chair of the Economic Development Accountability and Standards Committee on the progress of the State's economic development.

e.  The board is required to perform the following duties, if the Department contracts pursuant to G.S. 143B-431A for the performance of the Secretary's responsibilities under G.S. 143B-434.01:

1.  To provide advice concerning economic and community development planning for the State, including a strategic business facilities development analysis of existing, available buildings or shell or special-use buildings and sites.

2.  To recommend economic development policy to the Secretary of Commerce, the General Assembly, and the Governor.

3.  To recommend annually to the Governor biennial and annual appropriations for economic development programs.

4.  To recommend how best to coordinate economic development efforts among the various agencies and entities, including those created by executive order of the Governor, that receive economic development appropriations, including the assignment of key responsibilities for different aspects of economic development and resource allocation and planning designed to encourage each agency to focus on its area of primary responsibility and not diffuse its resources by conducting activities assigned to other agencies.

(3)  The amount of State funds that may be used for the annual salary of any one officer, employee, or member of a governing board of the nonprofit corporation with which the Department contracts pursuant to this section shall not exceed one hundred twenty-thousand dollars ($120,000).

(4)  The nonprofit corporation shall have received from fundraising efforts and sources, other than State funds, an amount totaling at least ten million dollars ($10,000,000) to support operations and functions of the corporation.

(e)     Mandatory Contract Terms. – Any contract entered into under this section must include all of the following:

(1)     A provision requiring the North Carolina nonprofit corporation provide to the Joint Legislative Economic Development and Global Engagement Oversight Committee, the Department of Commerce, and the Fiscal Research Division a copy of the corporation's annual audited financial statement within seven days of issuance of the statement.

(2)     A provision requiring the nonprofit corporation to provide, by September 1 of each year, and more frequently as requested, a report to the Department on prior State fiscal year program activities, objectives, and accomplishments and prior State fiscal year itemized expenditures and fund sources. The report shall also include all of the following:

a.     Jobs anticipated to result and actually resulting from efforts of the nonprofit corporation, itemized by county, by development tier area designation, as defined by G.S. 143B-437.08, and by Collaboration for Prosperity Zones created pursuant to G.S. 143B-28.1.

b.     Developed performance metrics of economic development functions, itemized by county, by development tier area designation, as defined by G.S. 143B-437.08, and by Collaboration for Prosperity Zones created pursuant to G.S. 143B-28.1.

c.     Any proposed amendments to the areas of expertise required to be represented on the governing board of the nonprofit corporation.

d.     A detailed explanation of how annual salaries are determined, including base pay schedules and any additional salary amounts or incentives that may be earned as a result of job performance. The explanation shall include the proportion of State and private funds for each position and shall include the means used by the nonprofit corporation to foster employee efforts for economic development in rural and low-income areas in the State.

(3)     A provision providing that, upon termination of the contract or a request by the Department for enforcement of the contract by the Attorney General, or upon repeal of the charter of the nonprofit corporation with which the Department has contracted under this section by the General Assembly, all assets and funds of the nonprofit corporation, including interest on funds, financial and operational records, and the right to receive future funds pursuant to the contract, will be surrendered to the Department within 30 days of the termination, request or repeal. During the 30-day period, the corporation may not further encumber any assets or funds. For funds surrendered pursuant to this provision that are subject to a written agreement signed by the board to create a legal and enforceable obligation of the corporation pursuant to subdivision (8) of this subsection, the Department shall use the funds for the same purposes for which the funds were obligated; for all other funds surrendered pursuant to this provision, the Department shall deposit the funds in the General Fund, and the funds shall remain unexpended and unencumbered until appropriated by the General Assembly. For purposes of this subdivision, assets and funds of the nonprofit corporation include assets and funds of any subsidiary or affiliate of the nonprofit corporation. An affiliate of the nonprofit corporation exists when both are directly or indirectly controlled by the same parent corporation or by the same or associated financial interests by stock ownership, interlocking directors, or by any other means whatsoever, whether the

10

control is direct or through one or more subsidiary, affiliated, or controlled corporations.

(4) A provision providing that any recommendation or advice to the Department be accompanied by a statement indicating whether the nonprofit corporation or any affiliated member of the corporation has received, directly or indirectly, any gift, contribution, or item or service of value for which fair market value was not paid if such was received from an entity that is the subject of the recommendation or advice. The statement shall also include the amount and date of each gift, contribution, or item or service of value received.

(5) A provision providing that the nonprofit corporation maintain a Website disclosing, within 30 days of occurrence, each of the following:

    a. The receipt, including the name of any entity from which the nonprofit corporation or any affiliated member of the corporation has received, directly or indirectly, of any gift, contribution, or item or service of value for which fair market value was not paid. The statement shall also include the amount and date of each gift, contribution, or item or service of value received. If the entity listed on the Website has a contract with this State, the nonprofit corporation shall note expressly the existence of contract with the State.

    b. The disbursement, including amount, recipient, and purpose and date of disbursement, of any funds awarded, granted, or loaned by the corporation.

(6) A provision encouraging the nonprofit corporation to seek private funds from businesses and entities that are unlikely to seek economic development incentives from or contracts with the State.

(7) A provision requiring the nonprofit corporation to maintain separate accounting records for and separate accounts for State and private funds and prohibiting any commingling of State and private funds. Records and accounts must be maintained according to generally accepted accounting principles.

(8) A provision requiring any lending, awarding, or granting of private funds of the nonprofit corporation be in a written agreement and signed by the board in order to create a legal and enforceable obligation of the corporation.

(9) A provision limiting the term of the contract to no more than four years. The term of the contract may be extended in one-year increments up to four times after no less than three fourths of the original contract term has passed. A contract extension may not extend the remaining term of the contract, including the term of the extension, to more than two years. Nothing in this subdivision shall be construed as a prohibition against entering into a new contract with the nonprofit corporation.

(10) A provision limiting the severance pay for the chief executive officer and other officers of the nonprofit corporation to no more than the lesser of the following:

    a. The salary limitation contained in subdivision (3) of subsection (d) of this section.

    b. The salary limitation contained in subdivision (3) of subsection (d) of this section multiplied by a fraction, the numerator of which is the number of whole years the chief officer has been chief officer of the corporation and the denominator of which is four.

(11) A provision requiring annual certification by the nonprofit corporation that it is in compliance with the following:
    a.    The requirements of Chapter 55A of the General Statutes.
    b.    The requirements of each of the provisions listed in subsection (e) of this section. For any provision in this subsection that the nonprofit corporation did not comply with, the corporation shall provide a detailed explanation of the circumstances and time of the noncompliance.

(12) A provision requiring the nonprofit corporation to contract with the Office of State Budget Management for performance review, including verifying eligibility for disbursement of funds from and reimbursement by the Department to the corporation. The performance review required by this section must occur no less than annually and must be according to generally accepted auditing principles.

(f)    Report. – By September 30 of each year, and more frequently as requested, the Department shall submit a report to the Joint Legislative Commission on Governmental Operations, the Joint Legislative Economic Development and Global Engagement Oversight Committee, and the Fiscal Research Division on any performance for which the Department has contracted pursuant to this section. The report shall contain, at a minimum, each of the following:

(1) A copy of the most recent report required by the Department pursuant subdivision (2) of subsection (e) of this section.

(2) An executive summary of the report required by subdivision (1) of this subsection.

(3) A listing of each entity to which a North Carolina nonprofit corporation with which the Department contracts pursuant to this section has recommended awarding funds and the amount of funds recommended to be awarded, and any other information the Secretary determines is necessary or that is specifically requested in writing.

(4) An explanation of the response by the Department to any notifications of noncompliance submitted to the Department by the nonprofit corporation, as required by G.S. 143B-431A(e), including actions taken by the Department to prevent repeat or similar instances of noncompliance.

(5) For each activity in which the Secretary of Commerce solicits funds for the corporation, as permitted by subsection (i) of this section, a listing of each activity, including the date, and the name of each person or entity from whom funds were solicited.

(g)    Public funds. – A North Carolina nonprofit corporation with which the Department contracts pursuant to this section shall comply with the requirements provided in this subsection regarding the use of State funds.

(1) Interest earned on State funds after receipt of the funds by the nonprofit corporation shall be used for the same purposes for which the principal was to be used.

(2) The travel and personnel policies and regulations of the State of North Carolina Budget Manual limiting reimbursement for expenses of State employees apply to reimbursements for expenses of officers, employees, or members of a governing board of the nonprofit corporation.

(h)    Applicable laws. – A North Carolina nonprofit corporation with which the Department contracts pursuant to this section is subject to the requirements of (i) Chapter 132 of the General Statutes and (ii) Article 33C of Chapter 143 of the General Statutes. Officers, employees, and members of the governing board of the corporation are public servants, as

defined in G.S. 138A-3, and are subject to the requirements of Chapter 138A of the General Statutes. Officers, members of the governing board, and employees of the corporation whose annual compensation is equal to or greater than sixty thousand dollars ($60,000) are subject to G.S. 138A-22.

(i)    Prohibition. – A State officer or employee, other than the Secretary of Commerce, shall not solicit funds for a North Carolina nonprofit corporation with which the Department contracts pursuant to this section. The Secretary of Commerce may solicit funds for the nonprofit corporation pursuant to G.S. 138A-31(b)(5).

(j)    Benefits. – An officer, employee, or member of a governing board of a North Carolina nonprofit corporation with which the Department contracts pursuant to this section is not a State employee, is not covered by Chapter 126 of the General Statutes, and is not entitled to State-funded employee benefits, including membership in the Teachers' and State Employees' Retirement System and the State Health Plan for Teachers and State Employees."

**SECTION 1.1.(b)**  G.S. 143B-431A(i), as enacted by this act, does not apply to employees of the Department of Commerce, other than those employees involved in the recommendation and administration of State economic development incentive programs, prior to the time the Department contracts with a North Carolina nonprofit corporation pursuant to this act.

**SECTION 1.2.(a)**  G.S. 143B-434 is repealed.

**SECTION 1.2.(b)**  G.S. 143B-434.01 reads as rewritten:

"**§ 143B-434.01.  Comprehensive Strategic Economic Development Plan.**

(a)    Definitions. – The following definitions apply in this section:

        (1)    ~~Board. – The Economic Development Board.~~

        ...

        (6)    Secretary. – The Secretary of Commerce or the governing board of a North Carolina nonprofit corporation with which the Department contracts pursuant to G.S. 143B-431A for the performance of the Secretary's responsibilities under this section.

(b)    ~~Board to Prepare~~ Plan. – The ~~Board~~ Secretary shall ~~prepare~~ review and update the existing Plan ~~by April 1, 1994.~~on or before April 1 of each year. ~~The Board shall review and update this Plan by April 1 of each year.~~ The ~~original~~ Plan shall cover a period of four years and each annual update shall extend the time frame by one year so that a four-year plan is always in effect. The ~~Board~~ Secretary shall provide copies of the Plan and each annual update to the Governor and the Joint Legislative Commission on Governmental Operations. The Plan shall encompass all of the components set out in this section.

(c)    Purpose. – The purpose of this section is to require the ~~Board~~ Secretary to apply strategic planning principles to its economic development efforts. This requirement is expected to result in:

        (1)    The selection of a set of priority development objectives that recognizes the increasingly competitive economic environment and addresses the changing needs of the State in a more comprehensive manner.

        (2)    The effective utilization of available and limited resources.

        (3)    A commitment to achieve priority objectives and to sustain the process.

(d)    (1)    Public and Private Input. – At each stage as it develops and updates the Plan, the ~~Board~~ Secretary shall solicit input from all parties involved in economic development in North Carolina, including:

            a.    Each of the programs and organizations that, for State budget purposes, identifies economic development as one of its global goals.

            b.    Local economic development departments and regional economic development organizations.

            c.    The Board of Governors of The University of North Carolina.

(2)     The ~~Board~~ Secretary shall also hold hearings in each of the Regions to solicit public input on economic development before the initial Plan is completed. The purposes of the public hearings are to:

    a.    Assess the strengths and weaknesses of recent regional economic performance.

    b.    Examine the status and competitive position of the regional resource base.

    c.    Identify and seek input on issues that are key to improving the economic well-being of the Region.

The ~~Board~~ Secretary shall hold additional hearings from time to time to solicit public input regarding economic development activities.

(3)     Each component of the Plan shall be based on this broad input and, to the extent possible, upon a consensus among all affected parties. The ~~Board~~ Secretary shall coordinate its planning process with any State capital development planning efforts affecting State infrastructure such as roads and water and sewer facilities.

(e)     Environmental Scan. -- The first step in developing the Plan shall be to develop an environmental scan based on the input from economic development parties and the public and on information about the economic environment in North Carolina. To prepare the scan, the ~~Board~~ Secretary shall gather the ~~following~~ information required in this subsection and ensure that the information is updated periodically. The updated information may be provided in whatever format and through whatever means is most efficient. The information required to prepare the scan includes all of the following:

    ...

(f)     Repealed by Session Laws 2012-142, s. 13.4(a), effective July 1, 2012.

(g)     Vision and Mission Statements. – The ~~Board~~ Secretary shall develop a vision statement for economic development that would describe the preferred future for North Carolina and what North Carolina would be like if all economic development efforts were successful. The ~~Board~~ Secretary shall then develop a mission statement that outlines the basic purpose of each of North Carolina's economic development programs. Because special purpose nonprofit organizations are uniquely situated to conduct the entrepreneurial and high-risk activity of investing in and supporting new business creation in the State, they should be assigned a dominant role in this key component of economic development activity.

(h)     Goals and Objectives. – The ~~Board~~ Secretary, using data from the public input and the environmental scan, shall formulate a list of goals and objectives. Goals shall be long-range, four years or more, and shall address both needs of economically distressed Regions and counties as well as opportunities for Regions and counties not distressed. The goals shall be developed with realism but should also be selected so as to encourage every Region and county within the State to develop to its maximum potential. Objectives shall be one year or less in scope and shall, if achieved, lead to the realization of the goals formulated by the ~~Board~~ Secretary as provided in this section.

Both goals and objectives should be stated largely in economic terms, that is, they should be related to specific population, employment, demographic targets, or economic sector targets. Both efficiency and equity considerations are to be addressed and balanced with special emphasis placed on the needs of disadvantaged or economically distressed populations and communities. The goals and objectives should not state how the economic targets are to be reached, but rather what the economic conditions will be if they are obtained. So that the progress of North Carolina's economic development efforts can be monitored, the ~~Board~~ Secretary shall set objectives for each goal that allow measurement of progress toward the goal. Objectives should be quantifiable and time-specific in order to serve as performance indicators.

    ...

14

1    (j)    Implementation Plan. – Based upon all of the foregoing steps, the ~~Board~~ Secretary
2    shall establish an implementation plan assigning to the appropriate parties specific
3    responsibilities for meeting measurable objectives. The implementation plan shall contain all
4    necessary elements so that it may be used as a means to monitor performance, guide
5    appropriations, and evaluate the outcomes of the parties involved in economic development in
6    the State.
7    (k)    Annual Evaluation. -- The ~~Board~~ Secretary shall annually evaluate the State's
8    economic performance based upon the statistics listed in this subsection and upon the ~~Board's~~
9    Secretary's stated goals and objectives in its Plan. The statistics upon which the evaluation is
10   made should be available to policymakers. The information may be provided in whatever
11   format and through whatever means is most efficient.
12        …
13   (l)    Accountability. – The ~~Board~~ Secretary shall make all data, plans, and reports
14   available to the General Assembly, the Joint Legislative Commission on Governmental
15   Operations, the Joint Legislative Economic Development and Global Engagement Oversight
16   Committee, the Senate Appropriations Committee on Natural and Economic Resources, and the
17   House of Representatives Appropriations Subcommittee on Natural and Economic Resources at
18   appropriate times and upon request. The ~~Board~~ Secretary shall prepare and make available on
19   an annual basis public reports on each of the major sections of the Plan and the Annual Report
20   indicating the degree of success in attaining each development objective."
21        **SECTION 1.2.(c)** G.S. 143B-437.03 is repealed.
22        **SECTION 1.3.** The Department of Commerce shall study and develop a plan for
23   contracting with a North Carolina nonprofit corporation pursuant to G.S. 143B-431A, as
24   enacted by this act, for the performance of economic development activities and duties of the
25   Department. The study shall include each of the following:
26        (1)    The Department shall develop a plan for private fundraising efforts for the
27             nonprofit corporation for the performance of economic development
28             functions. The study shall include the creation of a budget for the nonprofit
29             corporation that provides for the performance of core functions of the
30             corporation, including economic development functions, in the absence of
31             private funds. The study shall compare the budget of the Department and
32             budget developed for the nonprofit corporation according to Department
33             division and budget category, including personal services; purchased
34             services; supplies; property, plant, and equipment; other expenses and
35             adjustments; aid and public assistance; and other budget categories used by
36             the Department. The study shall include a measurement and estimation of
37             expected private fundraising potential, and the Department shall examine the
38             efforts of other states that have permitted public-private partnerships for
39             economic development activities and report on the source or sources of
40             funds for those partnerships, separately accounting for funds provided by the
41             state and private funds.
42        (2)    The Department shall report on each performance metric listed in this
43             subdivision. The report shall analyze the Department's performance for each
44             metric for (i) the last full year prior to contracting for performance of the
45             metric, (ii) the annual average for the five-year period preceding contracting
46             for performance of the metric, and (iii) the annual average for the 10-year
47             period preceding contracting for performance of the metric. The
48             performance metrics to be reported upon are as follows:
49             a.    For business and industry:
50                  1.    Number of projects announced by the Department.

2. Number of projects pursued by the Department that were not subsequently announced.

3. The originating source of and number of projects identified in sub-sub-subdivisions 1. and 2. of this sub-subdivision, including a designation of whether the project was identified by Departmental staff, local economic development partner, business source, or other source.

4. Percentage of projects pursued by the Department that resulted in announcement.

5. Number of jobs anticipated to be created at the time the projects are announced.

6. Cost per job in incentives awarded or granted.

7. Average number of years required for recoupment by the State of incentives awarded and authorized by the Department through increased State tax revenues.

8. Any foreign direct investment resulting from Departmental activities or expenditures or both.

b. For marketing:

1. Advertising and marketing budget for the State. Expenditures shall be itemized by print media, radio, television, internet, business trade shows and conventions, and other communication media.

2. Efficacy and means of evaluating efficacy of marketing efforts in promoting the State as a business destination, including instances of positive mentions of the State or the business environment of the State resulting from marketing efforts.

c. For international trade:

1. Expenditures of the Department, itemized by Departmental staff, independent entities with which the Department contracts, marketing and communication, trade shows, trade missions, and conventions.

2. Information on additional exports generated as a result of Departmental activities or expenditures or both.

d. For small business:

1. List of each service and support offered for small businesses in or exploring expansion in or into the State.

2. Number of small businesses to which services or support has been provided.

3. Number of jobs created or retained as a result of services or support provided.

e. For tourism:

1. Advertising and marketing budget for the State. Expenditures shall be itemized by print media, radio, television, internet, industry shows and conventions, and other communication media.

2. Efficacy and means of evaluating efficacy of marketing efforts in promoting the State as a tourism destination, including instances of positive mentions of the State or the tourism environment of the State resulting from marketing efforts.

16

3.     Number of tourists attracted as a result of Departmental efforts.

    f.     Any other information or performance metrics allowing comparison between Departmental and corporate performance for any other economic development division in the Department for which the Department contracts for performance with a North Carolina nonprofit corporation pursuant to this act.

    g.     Any other information or performance metrics deemed useful or necessary by the Department in the listed areas or other areas.

The Department shall make a report to the Office of State Budget Management, the Joint Legislative Commission on Governmental Operations, to the Joint Legislative Economic Development and Global Engagement Oversight Committee, and to the Fiscal Research Division no later than December 1, 2014.

The Department shall require the nonprofit corporation to include in each report mandated by G.S. 143B-431A(e)(2) an analysis of the corporation's performance and a comparison to Departmental performance using the same performance metrics studied and reported by the Department, as required by subdivision (2) of this section.

    **SECTION 1.4.** G.S. 126-5 reads as rewritten:

"**§ 126-5. Employees subject to Chapter; exemptions.**

...

(c2)     The provisions of this Chapter shall not apply to:

...

(5)     Officers, employees, and members of the governing board of a North Carolina nonprofit corporation with which the Department of Commerce has contracted pursuant to the authority granted in G.S. 143B-431A.

...

(d)   (1)     Exempt Positions in Cabinet Department. – Subject to the provisions of this Chapter, which is known as the State Personnel Act, the Governor may designate a total of 1,000 exempt positions throughout the following departments:

...

(2b)     Designation of Liaison Positions. – Liaisons to the Collaboration for Prosperity Zones set out in G.S. 143B-28.1 for the Departments of Commerce, Environment and Natural Resources, and Transportation are designated as exempt.

...."

    **SECTION 1.5** Section 15.7A of S.L. 2013-360 is repealed.

    **SECTION 1.6** Section 1.5 of this act is effective when it becomes law. The remainder of this Part becomes effective July 1, 2014.

# PART II. MODIFY NORTH CAROLINA BOARD OF SCIENCE AND TECHNOLOGY

    **SECTION 2.1.** Part 18 of Article 10 of Chapter 143B of the General Statutes reads as rewritten:

"Part 18. North Carolina Board of ~~Science and Technology.~~Science, Technology, and Innovation.

"**§ 143B-472.80. North Carolina Board of** ~~Science and Technology;~~**Science, Technology, and Innovation; creation; powers and duties.**

The North Carolina Board of ~~Science and Technology~~ Science, Technology, and Innovation of the Department of Commerce is created. The Board has the following powers and duties:

...

| | (4) | To advise and make recommendations to the Governor, the General |
|---|---|---|

    (4)    To advise and make recommendations to the Governor, the General Assembly, the Secretary of Commerce, and ~~the Economic Development Board~~ any North Carolina nonprofit corporation with which the Department of Commerce contracts pursuant to G.S. 143B-431A on the role of ~~science and technology~~ science, technology, and innovation in the economic growth and development of North Carolina.

    ...

**"§ 143B-472.81.  North Carolina Board of ~~Science and Technology;~~ Science, Technology, and Innovation; membership; organization; compensation; staff services.**

    (a)    The North Carolina Board of ~~Science and Technology~~ Science, Technology, and Innovation consists of the Governor, the Secretary of Commerce, and ~~17~~ 23 members appointed as follows: the Governor shall appoint one member from the University of North Carolina at Chapel Hill, one member from North Carolina State University at Raleigh, and two members from other components of the University of North Carolina, one of which shall be from a historically black college or university, all nominated by the President of the University of North Carolina; one member from Duke University, nominated by the President of Duke University; one member from a private college or university, other than Duke University, in North Carolina, nominated by the President of the Association of Private Colleges and Universities; one member of the North Carolina Community College System; one member representing K-12 public education; ~~one member from the Research Triangle Institute, nominated by the executive committee of the board of that institute; one member from the Microelectronics Center of North Carolina, nominated by the executive committee of the board of that center; one member from the North Carolina Biotechnology Center, nominated by the executive committee of the board of that center; four~~ six members from private industry in North ~~Carolina, at least one of whom shall be a professional engineer registered pursuant to Chapter 89C of the General Statutes or a person who holds at least a bachelors degree in engineering from an accredited college or university; and two members from public agencies in North Carolina.~~ Carolina; and seven at-large members. Two members shall be appointed by the General Assembly, one shall be appointed upon the recommendation of the President Pro Tempore of the Senate, and one shall be appointed upon the recommendation of the Speaker of the House of Representatives in accordance with G.S. 120-121. The nominating authority for any vacancy on the Board among members appointed by the Governor shall submit to the Governor two nominations for each position to be filled, and the persons so nominated shall represent different disciplines.

    ...."

    **SECTION 2.2.**  G.S. 143B-437.80 reads as rewritten:

**"§ 143B-437.80.  North Carolina SBIR/STTR Incentive Program.**

    (a)    Program. – There is established the North Carolina SBIR/STTR Incentive Program to be administered by the North Carolina Board of ~~Science and Technology.~~ Science, Technology, and Innovation. In order to foster job creation and economic development in the State, the Board may provide grants to eligible businesses to offset costs associated with applying to the United States Small Business Administration for Small Business Innovative Research (SBIR) grants or Small Business Technology Transfer Research (STTR) grants. The grants shall be paid from the One North Carolina Small Business Account established in G.S. 143B-437.71.

    ...

    (c)    Grant. – The North Carolina Board of ~~Science and Technology~~ Science, Technology, and Innovation may award grants to reimburse an eligible business for up to fifty percent (50%) of the costs of preparing and submitting a SBIR/STTR Phase I proposal, up to a maximum of three thousand dollars ($3,000). A business may receive only one grant under this section per year. A business may receive only one grant under this section with respect to each federal

18

1  proposal submission. Costs that may be reimbursed include costs incurred directly related to
2  preparation and submission of the grant such as word processing services, proposal consulting
3  fees, project-related supplies, literature searches, rental of space or equipment related to the
4  proposal preparation, and salaries of individuals involved with the preparation of the proposals.
5  Costs that shall not be reimbursed include travel expenses, large equipment purchases, facility
6  or leasehold improvements, and legal fees.
7      (d)    Application. -- A business shall apply, under oath, to the North Carolina Board of
8  ~~Science and Technology~~ Science, Technology, and Innovation for a grant under this section on
9  a form prescribed by the Board that includes at least all of the following:
10             ...."
11      **SECTION 2.3.** G.S. 143B-437.81 reads as rewritten:
12  "**§ 143B-437.81. North Carolina SBIR/STTR Matching Funds Program.**
13      (a)    Program. – There is established the North Carolina SBIR/STTR Matching Funds
14  Program to be administered by the North Carolina Board of ~~Science and Technology.~~ Science,
15  Technology, and Innovation. In order to foster job creation and economic development in the
16  State, the Board may provide grants to eligible businesses to match funds received by a
17  business as a SBIR or STTR Phase I award and to encourage businesses to apply for Phase II
18  awards.
19      ...
20      (c)    Grant. – The North Carolina Board of ~~Science and Technology~~ Science,
21  Technology, and Innovation may award grants to match the funds received by a business
22  through a SBIR/STTR Phase I proposal up to a maximum of one hundred thousand dollars
23  ($100,000). Seventy-five percent (75%) of the total grant shall be remitted to the business upon
24  receipt of the SBIR/STTR Phase I award and application for funds under this section.
25  Twenty-five percent (25%) of the total grant shall be remitted to the business upon submission
26  by the business of the Phase II application to the funding agency and acceptance of the Phase I
27  report by the funding agency. A business may receive only one grant under this section per
28  year. A business may receive only one grant under this section with respect to each federal
29  proposal submission. Over its lifetime, a business may receive a maximum of five awards
30  under this section.
31      (d)    Application. -- A business shall apply, under oath, to the North Carolina Board of
32  ~~Science and Technology~~ Science, Technology, and Innovation for a grant under this section on
33  a form prescribed by the Board that includes at least all of the following:
34             ...."
35
36  **PART III.  CREATION OF COLLABORATION FOR PROSPERITY ZONES**
37      **SECTION 3.1.** Intent to create Collaboration for Prosperity Zones. – It is the intent
38  of the General Assembly to establish geographically uniform zones in this State to facilitate
39  collaborative and coordinated planning and use of resources, to improve cooperation with other
40  governmental and nonprofit entities at the local and regional level, to facilitate administrative
41  efficiencies within State government, to receive advice on economic development issues by
42  local boards established by a North Carolina nonprofit corporation with which the Department
43  of Commerce contracts, and, to the extent feasible, to establish one-stop sources in each region
44  for citizens and businesses seeking State services at a regional level.
45      **SECTION 3.2.** Article 1 of Chapter 143B of the General Statutes is amended by
46  adding a new section to read:
47  "**§ 143B-28.1.  Create Collaboration for Prosperity Zones.**
48      For purposes of enhanced collaboration and cooperation between governmental agencies,
49  planning, use of resources, and improved efficiency at a regional level, the State is hereby
50  divided into eight permanent zones as follows:

1    (1) Western Region, consisting of Buncombe, Cherokee, Clay, Graham, Haywood, Henderson, Jackson, Macon, Madison, Polk, Rutherford, Swain, and Transylvania Counties.

   (2) Northwest Region, consisting of Alleghany, Ashe, Alexander, Avery, Burke, Caldwell, Catawba, McDowell, Mitchell, Watauga, Wilkes, and Yancey Counties.

   (3) Southwest Region, consisting of Anson, Cabarrus, Cleveland, Gaston, Iredell, Lincoln, Mecklenburg, Rowan, Stanly, and Union Counties.

   (4) Piedmont-Triad (Central) Region, consisting of Alamance, Caswell, Davidson, Davie, Forsyth, Guilford, Randolph, Rockingham, Stokes, Surry, and Yadkin Counties.

   (5) North Central Region, consisting of Chatham, Durham, Edgecombe, Franklin, Granville, Harnett, Johnston, Lee, Nash, Orange, Person, Vance, Wake, Warren, and Wilson Counties.

   (6) Sandhills (South Central) Region, consisting of Bladen, Columbus, Cumberland, Hoke, Montgomery, Moore, Richmond, Robeson, Sampson, and Scotland Counties.

   (7) Northeast Region, consisting of Beaufort, Bertie, Camden, Chowan, Currituck, Dare, Gates, Halifax, Hertford, Hyde, Martin, Northampton, Pasquotank, Perquimans, Pitt, Tyrrell, and Washington Counties.

   (8) Southeast Region, consisting of Brunswick, Carteret, Craven, Duplin, Greene, Jones, Lenoir, New Hanover, Onslow, Pamlico, Pender, and Wayne Counties."

**SECTION 3.3.** Agencies shall, by January 1, 2015, report to the Joint Legislative Commission on Governmental Operations and the Study Commission on Collaboration for Prosperity on how they plan to establish Collaboration for Prosperity Zones as defined by this act.

**SECTION 3.4.** G.S. 115C-65 reads as rewritten:

"**§ 115C-65. State divided into districts.**

The State of North Carolina shall be divided into eight educational ~~districts~~ districts, which shall match the composition of the zones set forth in G.S. 143B-28.1.~~embracing the counties herein set forth:~~

~~FIRST DISTRICT~~

~~Beaufort, Bertie, Camden, Chowan, Currituck, Dare, Gates, Hertford, Hyde, Martin, Pasquotank, Perquimans, Pitt, Tyrrell, Washington.~~

~~SECOND DISTRICT~~

~~Brunswick, Carteret, Craven, Duplin, Greene, Jones, Lenoir, New Hanover, Onslow, Pamlico, Pender, Sampson, Wayne.~~

~~THIRD DISTRICT~~

~~Durham, Edgecombe, Franklin, Granville, Halifax, Johnston, Nash, Northampton, Vance, Wake, Warren, Wilson.~~

~~FOURTH DISTRICT~~

20

1 ~~Bladen, Columbus, Cumberland, Harnett, Hoke, Lee, Montgomery, Moore, Richmond,~~
2 ~~Robeson, Scotland.~~
3
4 ~~FIFTH DISTRICT~~
5
6 ~~Alamance, Caswell, Chatham, Davidson, Forsyth, Guilford, Orange, Person, Randolph,~~
7 ~~Rockingham, Stokes.~~
8
9 ~~SIXTH DISTRICT~~
10
11 ~~Anson, Cabarrus, Cleveland, Gaston, Lincoln, Mecklenburg, Stanly, Union.~~
12
13 ~~SEVENTH DISTRICT~~
14
15 ~~Alexander, Alleghany, Ashe, Avery, Burke, Caldwell, Catawba, Davie, Iredell, Rowan,~~
16 ~~Surry, Watauga, Wilkes, Yadkin.~~
17
18 ~~EIGHTH DISTRICT~~
19
20 ~~Buncombe, Cherokee, Clay, Graham, Haywood, Henderson, Jackson, Macon, Madison,~~
21 ~~McDowell, Mitchell, Polk, Rutherford, Swain, Transylvania, Yancey."~~
22    **SECTION 3.5.** Section 3.4 of this act becomes effective April 1, 2015. Members
23 of the State Board of Education appointed by the Governor and confirmed by the General
24 Assembly prior to 2015 with terms ending in 2017, 2019, and 2021 shall be designated as the
25 appointees of the following districts for the remainder of the member's current term:
26     a.  Western Region:  Wayne McDevitt
27     b.  Southwest Region:  Gregory Alcorn
28     c.  Piedmont Triad (Central) Region:  A.L. Collins
29     d.  Sandhills (South Central) Region: Olivia Oxendine
30     e.  Northeast Region:  Rebecca Taylor
31     f.  Southeast Region:  Reginald Kenan
32    The remainder of this Part becomes effective July 1, 2014.
33
34 **PART IV. REQUIRE AT LEAST ONE LIAISON IN EACH COLLABORATION FOR**
35 **PROSPERITY ZONE**
36    **SECTION 4.1.** No later than January 1, 2015, the Departments of Commerce,
37 Environment and Natural Resources, and Transportation shall have at least one employee
38 physically located in the same office in each of the Collaboration for Prosperity Zones set out
39 in G.S. 143B-28.1 to serve as that department's liaison with the other departments and with
40 local governments, schools and colleges, planning and development bodies, and businesses in
41 that zone. The departments shall jointly select the office. For purposes of this Part, the
42 Department of Commerce may contract with a North Carolina nonprofit corporation pursuant
43 to G.S. 143B-431A, as enacted by this act, to fulfill the departmental liaison requirements for
44 each office in each of the Collaboration for Prosperity Zones.
45    No later than January 1, 2015, the Community Colleges System Office shall
46 designate at least one representative from a community college or from the Community
47 Colleges System Office to serve as a liaison in each Collaboration for Prosperity Zone for the
48 community college system, the community colleges in the zone, and other educational agencies
49 and schools within the zone. A liaison may be from a business center located in a community
50 college. These liaisons are not required to be collocated with the liaisons from the Departments
51 of Commerce, Environment and Natural Resources, and Transportation.

No later than January 1, 2015, the State Board of Education shall designate at least one representative from a local school administrative unit or from the Department of Public Instruction to serve as a liaison in each Collaboration for Prosperity Zone for the local school administrative units and other public schools within the zone. These liaisons are not required to be collocated with the liaisons from the Departments of Commerce, Environment and Natural Resources, and Transportation.

**SECTION 4.2.**  In addition to other related tasks assigned by their respective agencies, liaisons in each Collaboration for Prosperity Zone shall work to enhance collaboration and cooperation between their departments and other State agencies, local governmental agencies, and other regional public and nonprofit entities. The liaisons from the Departments of Environment and Natural Resources and Transportation shall work to consolidate and simplify the process for citizens and businesses seeking permits from their respective agencies. The liaisons from the Department of Commerce shall be used to support local economic development efforts, to coordinate such efforts, and to coordinate the Department of Commerce's activities within each Collaboration for Prosperity Zone. The liaisons from the community college system and local school administrative units shall work closely with the Department of Commerce and other State and local governmental agencies and local businesses in the zone to promote job development through career technical education.

**SECTION 4.3.(a)**  The Departments of Transportation and Environment and Natural Resources shall jointly report to the Office of State Budget and Management, the Joint Legislative Commission on Governmental Operations, the Joint Legislative Transportation Oversight Committee, the Environmental Review Commission, and the Study Commission on Interagency Collaboration for Prosperity, as follows:

  (1)  No later than January 1, 2015, on the establishment of collocated liaisons within each Collaboration for Prosperity Zone and a description of the activities the liaisons have been assigned to perform.

  (2)  No later than April 1, 2015, on the activities of the liaisons, specifically any activities undertaken that resulted in enhanced collaboration and coordination with the other Department and with other governmental agencies, improved administrative efficiencies, and any steps taken to make services to citizens and businesses within each zone more efficient, economical, and user-friendly.

**SECTION 4.3.(b)**  The Community Colleges System Office and the State Board of Education shall each report to the Office of State Budget and Management, the Joint Legislative Commission on Governmental Operations, the Joint Legislative Education Oversight Committee, and the Study Commission on Interagency Collaboration for Prosperity, as follows:

  (1)  No later than January 1, 2015, on the establishment of liaisons within each Collaboration for Prosperity Zone and a description of the activities the liaisons have been assigned to perform.

  (2)  No later than April 1, 2015, on the activities of the liaisons, specifically any activities undertaken that resulted in enhanced collaboration and coordination with other governmental agencies, improved planning on use of educational resources, and improved administrative efficiencies.

**SECTION 4.3.(c)**  The Department of Commerce shall include in its first report under G.S. 143B-431(c1), as enacted by this act, a report on the establishment and activities of its liaisons in each Collaboration for Prosperity Zone. The Department of Commerce shall send a copy of this report to the Office of State Budget and Management and to the Study Commission on Interagency Collaboration for Prosperity.

**SECTION 4.4.**  The Departments of Commerce, Environment and Natural Resources, and Transportation, the Community Colleges System Office, and the State Board of

22

1  Education shall use funds available to carry out the requirements of this section. Nothing in
2  this act shall be construed as an authorization for payment of additional compensation for
3  persons serving as liaisons.
4        **SECTION 4.5.**  This Part becomes effective July 1, 2014, and expires July 1, 2018.
5
6  **PART V. STUDY COMMISSION ON INTERAGENCY COLLABORATION FOR**
7  **PROSPERITY**
8        **SECTION 5.1.(a)**  Creation of Commission. – The Study Commission on
9  Interagency Collaboration for Prosperity is established in the General Assembly.
10       **SECTION 5.1.(b)**  Membership. – The Study Commission on Interagency
11 Collaboration for Prosperity shall consist of eight members, four members of the Senate
12 appointed by the President Pro Tempore of the Senate and four members of the House of
13 Representatives appointed by the Speaker of the House of Representatives.
14       **SECTION 5.1.(c)**  Cochairs; Vacancies; Quorum. – The Study Commission on
15 Interagency Collaboration for Prosperity shall have two cochairs, one designated by the
16 President Pro Tempore of the Senate and one designated by the Speaker of the House of
17 Representatives from among their respective appointees. The Commission shall meet upon the
18 call of the cochairs. Any vacancy on the Commission shall be filled by the original appointing
19 authority. A majority of the members of the Commission constitutes a quorum.
20       **SECTION 5.1.(d)**  Compensation; Administration. -- Members of the Study
21 Commission on Interagency Collaboration for Prosperity shall receive per diem, subsistence,
22 and travel allowances in accordance with G.S. 120-3.1. The Commission, while in the
23 discharge of its official duties, may exercise all powers provided for under G.S. 120-19 and
24 G.S. 120-19.1 through G.S. 120-19.4. The Commission may meet in the Legislative Building or
25 the Legislative Office Building.
26       With approval of the Legislative Services Commission, the Legislative Services
27 Officer shall assign professional staff to assist the Study Commission on Interagency
28 Collaboration for Prosperity in its work. The House of Representatives' and the Senate's
29 Directors of Legislative Assistants shall assign clerical staff to the Study Commission on
30 Interagency Collaboration for Prosperity, and the expenses relating to the clerical employees
31 shall be borne by the Commission. The Study Commission on Interagency Collaboration for
32 Prosperity may contract for professional, clerical, or consultant services, as provided by
33 G.S. 120-32.02.
34       **SECTION 5.2.(a)**  Duties. – The Study Commission on Interagency Collaboration
35 for Prosperity shall review the reports submitted by the Departments of Commerce,
36 Environment and Natural Resources, and Transportation, the Community Colleges System
37 Office, and the State Board of Education pursuant to Part IV of this act and any other
38 information the Commission deems relevant. The Commission may also study and recommend
39 to the 2015 Regular Session of the General Assembly legislation on the following topics:
40       (1)   Enhancing collaboration and cooperation between State and other
41            governmental agencies in order to streamline and improve services to
42            citizens and businesses, to make such services more user-friendly, and to
43            implement collaborative and cooperative interagency measures to enhance
44            access to services.
45       (2)   Reducing barriers faced by citizens and businesses in accessing services that
46            are unnecessarily caused by agency specialization (which may produce a
47            "silo mentality").
48       (3)   Additional recommendations regarding liaison personnel, including
49            expanding the requirement to other State departments.

|     |     |                                                                                          |
|-----|-----|------------------------------------------------------------------------------------------|
| 1   | (4) | Ways to integrate collaboration between educational institutions in each                 |
| 2   |     | Collaboration for Prosperity Zone on the one hand and other governmental                 |
| 3   |     | agencies and local businesses on the other.                                              |
| 4   | (5) | Requiring the establishment of interagency one-stop shops in each                        |
| 5   |     | Collaboration for Prosperity Zone.                                                       |
| 6   | (6) | Consolidation of programs or services.                                                   |
| 7   | (7) | Cross-training of employees.                                                             |
| 8   | (8) | Identification of offices, equipment, and support services that may be                   |
| 9   |     | efficiently and economically shared between agencies in each Collaboration               |
| 10  |     | for Prosperity Zone.                                                                     |
| 11  | (9) | The grouping of counties within each Collaboration for Prosperity Zone to                |
| 12  |     | determine whether there is a better configuration while keeping the same                 |
| 13  |     | overall number of zones.                                                                 |

14 The report containing the recommendations shall identify any savings or costs identified by the
15 Commission as likely to result from its recommendations.

16       **SECTION 5.2.(b)** Report. – The Study Commission on Interagency Collaboration
17 for Prosperity shall report its recommendations under this section to the 2015 Regular Session
18 of the General Assembly.

19       **SECTION 5.2.(c)** Agency Cooperation. – All State departments and agencies and
20 local governments and their subdivisions shall furnish the Study Commission on Interagency
21 Collaboration for Prosperity with any information in their possession or available to them.

22       **SECTION 5.2.(d)** Commission Termination. – The Study Commission on
23 Interagency Collaboration for Prosperity shall terminate on the filing of its report or on July 1,
24 2015, whichever is later.

25

26 **PART VI. EFFECTIVE DATE AND CONSTRUCTION**
27       **SECTION 6.1.** Nothing in this act shall be construed to obligate the General
28 Assembly to appropriate funds to implement this act.
29       **SECTION 6.2.** Except as otherwise provided, this act is effective when it becomes
30 law.

24



# Bill Draft 2013-MCz-231*:
# NC Econ. Dev. Partnership Modifications.

*2013-2014 General Assembly*

| Committee: | Joint Legislative Economic Development and Global Engagement Oversight Committee | Date: | March 31, 2014 |
|---|---|---|---|
| Introduced by: | Sen. Brown, Rep. Murry | Prepared by: | Dan Ettefagh |
| Analysis of: | 2013-MCz-231* | | Committee Counsel |

**SUMMARY:** *Senate Bill 127 would (i) permit the Department of Commerce to contract with a North Carolina nonprofit corporation for the performance of certain economic development functions currently performed by the Department, (ii) eliminate the Economic Development Board, (iii) modify the duties and membership of the North Carolina Board of Science and Technology, and (iv) establish 8 geographic zones in the State for inter-departmental cooperation purposes.*

**BILL ANALYSIS:**

Part I of the bill establishes the framework for the Department of Commerce to contract with a nonprofit corporation for advisory, research, and recruiting recommendations regarding economic development incentives or grant awards, and for marketing and consultation in the development of long-range economic development planning. The bill incorporates a number of requirements regarding contracting that can be broadly categorized as follows: limitations on scope, oversight requirements, contractual pre-requisites, mandatory contract terms, reporting requirements, applicability of laws provisions.

**Limitations on Scope:** The contract for performance is limited in scope by disallowing for the contracting of the following economic development functions of the Department:

- The obligation or commitment of funds under Article 10 (Commerce) of Chapter 143B of the General Statutes; however, recruitment, negotiation, and recommendations relating to economic development programs would fall within the purview of the nonprofit corporation.

- The Division of Employment Security, including the administration of unemployment insurance.

- The functions, powers, duties, and obligations vested in the State Board of Alcoholic Control, the North Carolina Utilities Commission, the North Carolina Industrial Commission, the State Banking Commission and the Commissioner of Banks, the Savings Institutions Division, the Credit Union Commission, the North Carolina Mutual Burial Association Commission, and the North Carolina Rural Electrification Authority.

- The administration of federal funds or grants.

**Oversight:** A nonprofit corporation contracted with by the Department would be overseen by an Economic Development Accountability & Standards Committee, consisting of the Secretaries of Commerce (Chair), Transportation, Environment and Natural Resources, and Revenue, one member appointed by the Speaker of the House, one member appointed by the President Pro Tempore of the Senate, and one member jointly appointed by the Speaker and President Pro Temp. No member may be a member of the General Assembly. The Committee would meet at least quarterly and would function to do the following:

- Monitor/oversee the performance of the contract by the nonprofit corporation.

*Kory Goldsmith*
*Director*



*Legislative Drafting*
*(919) 733-6660*

- Receive, review, and refer complaints, as appropriate.
- Request enforcement of the contract by the Attorney General or the Department.
- Audit the records of the nonprofit corporation to verify data affecting performance and reports.
- Coordinate economic development grant programs between the Departments of Commerce, Transportation, and Environment and Natural Resources.
- Perform other contractual duties.

**Contractual Pre-requisites:** The contractual authority granted in the bill and the permission to receive State funds by a nonprofit pursuant to a contract do not arise until certain prerequisites are satisfied, as follows:

- At least 45 days prior to entering or substantively amending the contract, the Department submits the contract and a detailed explanation to GovOps and the Fiscal Research Division.
- The nonprofit corporation's governing board meets the following requirements:
  - It is composed of 17 members (9 Governor appointees, including the chair, 4 Senate appointees, and 4 House appointees). The appointees must reflect the geographic diversity of the State, and the Governor's appointees must meet expertise requirements.
  - No member of the board may take actions or use their position for self, business, or familial profit.
  - No State officer or employee may serve on the board.
  - The board must meet at least quarterly and report to the Economic Development Accountability & Standards Committee on economic development progress.
- The amount of State funds used for annual salaries for individual employees and officers of the corporation is capped at $120,000 per annum.
- *The nonprofit corporation receives from sources other than the State funds totaling at least $10M.*

**Mandatory Contract Terms:** A contract authorized by the bill must contain the following terms:

- A provision requiring annual audited financial statements be submitted within 7 days of issuance to the Fiscal Research Division, the Joint Legislative Economic Development and Global Engagement Oversight Committee, and the Department.
- A provision requiring annual reporting to the Department on program activities, objectives, accomplishments, expenditures, and fund sources, as well as anticipated and resulting jobs from the nonprofit's activities, itemized performance metrics, proposed amendments to areas of expertise for the governing board, *and an explanation of how salaries are determined (base pay and incentive pay, including incentives designed to aid rural/low-income area development).*
- A provision requiring that, upon termination or enforcement of the contract or upon repeal of the charter of the corporation, the corporation's assets and funds (including those of affiliated and subsidiary entities) must be returned to the Department *within 30 days (during which no*

26

*further encumbering may occur). Legally obligated funds are used pursuant to the obligation; other funds are returned to the General Fund.*

- A provision requiring that any recommendations or advice to the Department include a disclosure of whether the corporation has received from an entity that is the subject of the recommendation or advice anything of value for which full consideration was not paid, including the amount and date of the gift.

- *A provision requiring the corporation to maintain a website for disclosure, within 30 days, of (i) gifts, contributions, items/services of value for which FMV was not paid, including date, amount, and donor of the gift and whether the donor has a contract with the State and (ii) disbursement (including amount, recipient, purpose and date) of funds awarded, granted or loaned by the corporation.*

- *A provision encouraging the corporation to fundraise from sources unlikely to seek incentives from the State.*

- *A provision requiring separate accounts and bookkeeping by the corporation for State and private funds and prohibiting commingling of funds.*

- *A provision requiring lending, awarding, or granting of funds by the corporation to be in writing and signed by the Board to be legal and enforceable.*

- *A provision limiting the term and renewal provisions of the contract between the Department and the nonprofit corporation. The maximum initial term is 4 years. The maximum number of term extensions is 4. The maximum single term extension is 1 year. No extention may occur prior to ¾ of the initial term passing.*

- *A provision limiting the severance pay of the chief officers to the lesser of $120,000 or (number of whole years in chief officer position/4) x ($120,000).*

- An annual certification that the corporation is in compliance with the North Carolina Nonprofit Corporation Act *and has complied with all mandatory contract terms (or an explanation of noncompliance).*

- *A provision requiring the corporation contract with OSBM for performance review, including verifying disbursements and entitlement to reimbursement by the Department. The audit must comply with GAAP requirements.*

**Reporting and Applicability of Laws:** The Department must annually report to EDGE, GovOps, and the Fiscal Research Division on any performance for which the Department has contracted with a nonprofit corporation. The report must contain the report received by the Department from the nonprofit, an executive summary of that report, a listing of each entity for which the corporation has recommended awards, *an explanation of response by the Department for corporate noncompliance with mandatory contract terms, and any soliciting of funds by the Secretary of Commerce on behalf of the corporation.* A corporation contracted with must adhere to public records laws and open meetings laws, *and corporate personnel is subject to the State Ethics Act. Interest earned on State funds must be used for the same purposes as the principal, and travel and personnel expenses reimbursed by State funds must adhere to reimbursement limitations in the North Carolina Budget manual used for State employees.*

*The draft makes clear the Secretary can engage in solicitation of funds for the corporation, but other State employees cannot engage in solication of funds for the corporation. In addition, corporate*

*personnel are not State employees, are not covered by the State Personnel Act, and are not entitled to State-funded employee benefits.*

The remaining provisions of Part I include (i) a repeal of the Economic Development Board, (ii) an authorization to allow the Secretary to delegate the Secretary's responsibilities with respect to a comprehensive strategic economic development plan to the governance board of the nonprofit corporation with which the Department has contracted, (iii) a requirement that the governing board of the nonprofit corporation continue functions previously performed by the Economic Development Board, (iv) an exemption for Collaboration for Prosperity Zone liaisons and officers, board members, and employees of the nonprofit corporation from certain provisions of the State Personnel Act, and (v) *a requirement that the Department study and develop:*

- *A plan for private fundraising efforts for the nonprofit corporation, including private fundraising potential, private fundraising in other states, creating a budget for the corporation without private fundraising and comparing the budget with amounts required by the Department for the same functions.*

- *A report on various performance metrics for the Department for the last year and annual averages for the last 5- and 10-year periods. The Department must report to OSBM, GovOps, EDGE, and FRD no later than 12/1/14, and the Department must require the nonprofit corporation to report on the same metrics for comparison purposes to Departmental performance.*

Part I of the bill repeals the budgetary provision authorizing privatization of Departmental functions.

Part II of the bill renames the North Carolina Board of Science and Technology as the North Carolina Board of Science, Technology, and Innovation, which would gain the duty to advise and make recommendations to the nonprofit corporation on the role of science, technology, and innovation. The composition of the Board would be changed, increasing from 17 to 23 members. New members include one member of the North Carolina Community Colleges System, one member representing K-12 public education, 2 additional private industry members, and 7 at-large members. Of the existing two members appointed by the Governor from components of The University of North Carolina system other than UNC-CH and NCSU, one member must be from a historically black college or university. Eliminated members include one member from the Research Triangle Institute (nominated by its executive committee), one member from the Microelectronics Center of NC (nominated by its executive committee), one member from the Biotechnology Center (nominated by its executive committee), and two members from public agencies in the State. An additional elimination is the requirement that at least one member be a professional, registered engineer with a degree from an accredited college or university.

Part III of the bill divides the State into 8 geographic regions to facilitate collaborative and coordinated planning and resource use, improve cooperation, facilitate increased efficiencies, receive advice on economic development issues by local boards established by a nonprofit corporation, and establish one-stop assistance in each region for citizens and businesses. The bill would require that the Departments of Commerce, Environment and Natural Resources, and Transportation each provide one employee to each regional office to serve as that department's liaison with other departments and with local governments, schools and colleges, businesses, and other developmental planning bodies. The Community Colleges System Office and *State Board of Education* would also be required to designate one representative to serve as a liaison in each zone. Office location shall be jointly selected, and Commerce would be authorized to contract with the nonprofit corporation to fulfill the Department's liaison responsibilities. Part IV includes reporting requirements on the establishment and activities of

28

liaisons by Commerce, the Community Colleges System Office, *the State Board of Education*, the Department of Transportation and DENR. *Finally, Part IV modifies the existing educational districts to match the Prosperity Zone composition.*

Part V of the bill creates the Study Commission on Interagency Collaboration for Prosperity, consisting of 8 members, 4 from each legislative chamber. The Commission must review the reports required in Part IV of the bill and make recommendations to and report to the 2015 Regular Session of the General Assembly on issues that would increase efficiency and collaboration regarding business and economic development and recruitment and the use of resources.

**EFFECTIVE DATE:** Other than the repeal of the budgetary privatization provision, which becomes effective when the act becomes law, Parts I and III become effective 7/1/14. Part IV becomes effective 7/1/14 and expires 7/1/18. The remainder of the act is effective when it becomes law.

H                                                                        D

BILL DRAFT 2013-MCz-214 [v.12]   (02/10)

(THIS IS A DRAFT AND IS NOT READY FOR INTRODUCTION)
4/2/2014 4:46:25 PM

| Short Title: | Patent Abuse Bill. | (Public) |
|---|---|---|
| Sponsors: | Representative Murry. | |
| Referred to: | | |

| | | |
|---|---|---|
| 1 | | A BILL TO BE ENTITLED |
| 2 | AN ACT TO PREVENT THE ABUSIVE USE OF PATENTS. |
| 3 | The General Assembly of North Carolina enacts: |
| 4 | **SECTION 1.** Chapter 75 of the General Statutes is amended by adding a new |
| 5 | Article to read: |
| 6 | "Article 8. |
| 7 | "Abusive Patent Assertions. |
| 8 | "§ 75-136. Title. |
| 9 | This Article shall be known and may be cited as the "Abusive Patent Assertions Act" |
| 10 | "§ 75-137. Purpose. |
| 11 | (a) The General Assembly finds the following: |
| 12 | (1) North Carolina is home to a growing high-technology, knowledge-based |
| 13 | economy. With its top-tier research universities and active technology |
| 14 | sector, North Carolina is poised to continue its growth. To continue growing, |
| 15 | North Carolina must attract new, small, or midsized technology companies. |
| 16 | Doing so will help provide jobs for North Carolina's residents and boost |
| 17 | North Carolina's economy. North Carolina also is home to companies in |
| 18 | retail, manufacturing, and other industries, many of whom are customers of |
| 19 | technology companies. Those other businesses are more likely to succeed if |
| 20 | not inhibited by abusive and bad faith demands and litigation. |
| 21 | (2) Patents encourage research, development, and innovation. Patent holders |
| 22 | have legitimate rights to enforce their patents. |
| 23 | (3) The General Assembly does not wish to interfere with good faith patent |
| 24 | litigation or the good faith enforcement of patents. The General Assembly |
| 25 | also recognizes that North Carolina is preempted from passing any law that |
| 26 | conflicts with federal patent law. |
| 27 | (4) Patent litigation can be technical, complex, and expensive. The expense of |
| 28 | patent litigation, which may cost millions of dollars, can be a significant |
| 29 | burden on small- and medium-sized companies. North Carolina wishes to |
| 30 | help its businesses avoid these costs by encouraging the most efficient |
| 31 | resolution of patent infringement claims without conflicting with federal |
| 32 | law. |
| 33 | (5) In order for North Carolina companies to be able to respond promptly and |
| 34 | efficiently to patent infringement assertions against them, it is necessary that |

they receive specific information regarding how their product, service, or technology may have infringed the patent at issue. Receiving this information at an early stage will facilitate the resolution of claims and lessen the burden of potential litigation on North Carolina companies.

(6) Abusive patent litigation, and especially the assertion of bad faith infringement claims, can harm North Carolina companies. A business that receives a letter asserting such claims faces the threat of expensive and protracted litigation and may feel that it has no choice but to settle and to pay a licensing fee, even if the claim is meritless. This is especially so for small and medium sized companies and nonprofits that lack the resources to investigate and defend themselves against infringement claims.

(7) Not only do bad faith patent infringement claims impose a significant burden on individual North Carolina businesses, they also undermine North Carolina's efforts to attract and nurture technology and other companies. Funds used to avoid the threat of bad faith litigation are no longer available to invest, produce new products, expand, or hire new workers, thereby harming North Carolina's economy.

(8) North Carolina has a strong interest in patent matters involving its citizens and its businesses, including protecting its citizens and businesses against abusive patent assertions and ensuring North Carolina companies are not subjected to abusive patent assertion by entities acting in bad faith.

(9) In lawsuits involving abusive patent assertions, an accused infringer prevailing on the merits will usually be awarded its costs, and less frequently, its fees. These awards do not serve as a deterrent to abusive patent assertion entities who have limited liability, as these companies may hold no cash or other assets. North Carolina has a strong interest in making sure that prevailing North Carolina companies sued by abusive patent assertion entities can recover what is awarded to them.

(b) The General Assembly seeks, by this narrowly tailored act, to strike a balance between (i) the interests of efficient and prompt resolution of patent infringement claims, protection of North Carolina businesses from abusive and bad faith assertions of patent infringement, and building of North Carolina's economy and (ii) the intentions to respect federal law and be careful to not interfere with legitimate patent enforcement actions.

"§ 75-138. Definitions.

The following definitions apply in this Article:

(1) Demand. – A letter, e-mail, or other communication asserting or claiming that a target has engaged in patent infringement or should obtain a license to a patent.

(2) Target. – A North Carolina person that meets one or more of the following:

a. The person has received a demand or is the subject of an assertion or allegation of patent infringement.

b. The person has been threatened with litigation or is the defendant of a filed lawsuit alleging patent infringement.

c. The person has customers who have received a demand asserting that the person's product, service, or technology has infringed a patent.

(3) Interested Party. – A person, other than the party alleging infringement, that (i) is an assignee of the patent or patents at issue; (ii) has a right, including a contingent right, to enforce or sublicense the patent or patents at issue; or (iii) has a direct financial interest in the patent or patents at issue, including the right to any part of an award of damages or any part of licensing revenue. A "direct financial interest" does not include either of the following:

a. An attorney or law firm providing legal representation in the civil action described in sub-subdivision b. of subdivision (2) of this section if the sole basis for the financial interest of the attorney or law firm in the patent or patents at issue arises from the attorney or law firm's receipt of compensation reasonably related to the provision of the legal representation.

b. A person whose sole financial interest in the patent or patents at issue is ownership of an equity interest in the party alleging infringement, unless such person also has the right or ability to influence, direct, or control the civil action.

"§ 75-139. Abusive Patent Assertions.

(a) It is unlawful for a person to make a bad faith assertion of patent infringement. A court may consider the following factors as evidence that a person has made a bad faith assertion of patent infringement:

(1) The demand does not contain all of the following information:

a. The patent application number or patent number.

b. The name and address of the patent owner or owners and assignee or assignees, if any.

c. Factual allegations concerning the specific areas in which the target's products, services, and technology infringe the patent or are covered by specific, identified claims in the patent.

d. An explanation of why the person making the assertion has standing, if the United States Patent and Trademark Office's assignment system does not identify the person asserting the patent as the owner.

(2) Prior to sending the demand, the person failed to conduct an analysis comparing the claims in the patent to the target's products, services, and technology, or the analysis was done but does not identify specific areas in which the products, services, and technology are covered by the claims in the patent.

(3) The demand lacks the information described in subdivision (1) of this subsection, the target requests the information, and the person fails to provide the information within a reasonable period of time.

(4) The person demands payment of a license fee or response within an unreasonably short period of time.

(5) The person offers to license the patent for an amount that is not based on a reasonable estimate of the value of the license, or the person offers to license the patent for an amount that is based on the cost of defending a potential or actual lawsuit.

(6) The claim or assertion of patent infringement is meritless, and the person knew or should have known that the claim or assertion is meritless; or the claim or assertion relies on an interpretation of the patent that was disclaimed during prosecution and the person making the claim or assertion knows or should have known about the disclaimer, or would have known about the disclaimer if the person reviewed the patent's prosecution history.

(7) The claim or assertion of patent infringement is deceptive.

(8) The person or its subsidiaries or affiliates have previously or concurrently filed or threatened to file one or more lawsuits based on the same or similar claim of patent infringement and (i) those threats or lawsuits lacked the information described in subdivision (1) of this subsection or (ii) the person attempted to enforce the claim of patent infringement in litigation and a court found the claim to be meritless.

32

| | | |
|---|---|---|
| (9) | The person making the claim or assertion sent the same demand or substantially the same demand to multiple recipients and made assertions against a wide variety of products and systems without reflecting those differences in a reasonable manner in the demands. |
| (10) | The person making the claim or assertion is aware of, but does not disclose, any final, non-final, or preliminary post-grant finding of invalidity or unpatentability involving the patent. |
| (11) | The person making the claim or assertion seeks an injunction when that is objectively unreasonable under the law. |
| (12) | Any other factor the court finds relevant. |

(b)  A court may consider the following factors as evidence that a person has not made a bad faith assertion of patent infringement:

| | | |
|---|---|---|
| (1) | The demand contains the information described in subdivision (a)(1) of this section. |
| (2) | Where the demand lacks the information described in subdivision (a)(1) of this section and the target requests the information, the person provides the information within a reasonable period of time. |
| (3) | The person engages in a good faith effort to establish that the target has infringed the patent and to negotiate an appropriate remedy. |
| (4) | The person makes a substantial investment in the use of the patent or in the production or sale of a product or item that the person reasonably believes is covered by the patent. "Use of the patent" in the preceding sentence means actual practice of the patent and does not include licensing without actual practice. |
| (5) | The person is either (i) the inventor or joint inventor of the patent or, in the case of a patent filed by and awarded to an assignee of the original inventor or joint inventor, is the original assignee or (ii) an institution of higher education or a technology transfer organization owned or affiliated with an institution of higher education. |
| (6) | The person has demonstrated good faith business practices in previous efforts to enforce the patent, or a substantially similar patent, or has successfully enforced the patent, or a substantially similar patent, through litigation. |
| (7) | Any other factor the court finds relevant. |

(c)  Nothing in this Article shall be construed to apply a demand letter or assertion of patent infringement arising under 35 U.S.C. 271(e)(2) or 42 U.S.C. 262.

(d)  Subject to the provisions of subsections (a) and (b) of this section and provided the activities are not carried out in bad faith, nothing in this section shall be construed to deem it an unlawful practice, in and of itself, for any person who owns or has the right to license or enforce a patent to do any of the following:

| | | |
|---|---|---|
| (1) | Advise others of that ownership or right of license or enforcement. |
| (2) | Communicate to others that the patent is available for license or sale. |
| (3) | Notify another of the infringement of the patent. |
| (4) | Seek compensation on account of past or present infringement or for a license to the patent. |

"**§ 75-140. Bond.**

(a)  Upon motion by a target and a finding by the court that a target has established a reasonable likelihood that a person has made a bad faith assertion of patent infringement in violation of this chapter, the court shall require the person to post a bond in an amount equal to a good faith estimate of the target's fees and costs to litigate the claim and amounts reasonably likely to be recovered under G.S. 75-141, conditioned upon payment of any amounts finally

1     determined to be due to the target. A hearing shall be held if either party so requests. A bond
2     ordered pursuant to this section shall not exceed $500,000.00.
3         (b)      The court may waive the bond requirement of subsection (a) of this section if it
4     finds the person has available assets equal to the amount of the proposed bond or for other good
5     cause shown.
6         (c)      If the person asserting patent infringement cannot pay any fees or costs ordered by
7     any court in a matter related to the same asserted patent infringement, those fees or costs shall
8     be paid out of the bond posted under subsection (a) of this section, without affecting the
9     obligation of the person asserting patent infringement to pay any remainder of those fees or
10    costs not paid out of the bond.
11    "**§ 75-141. Enforcement; Remedies; Damages.**
12        (a)      The Attorney General shall have the same authority under this Chapter to make
13    rules, conduct civil investigations, bring civil actions, and enter into assurances of
14    discontinuance as provided under this Chapter. In an action brought by the Attorney General
15    pursuant to this section, the court may award or impose any relief available under this Chapter.
16        (b)      A target or a person aggrieved by a violation of this Chapter or by a violation of
17    rules adopted under this Chapter, may bring an action in Superior Court against a person that
18    has made a bad faith assertion of patent infringement. A court may award to a plaintiff who
19    prevails in an action brought pursuant to this subsection one or more of the following remedies:
20            (1)     Equitable relief.
21            (2)     Damages.
22            (3)     Costs and fees, including reasonable attorney's fees.
23            (4)     Exemplary damages in an amount equal to $50,000.00 or three times the
24                   total of damages, costs, and fees, whichever is greater.
25        (c)      Joinder of interested parties. – In an action arising under subsections (a) or (b) of
26    this section, the court shall grant a motion by the Attorney General or a target to join an
27    interested party if the moving party shows that the party alleging infringement has no
28    substantial interest in the patent or patents at issue other than making demands or asserting such
29    patent claim in litigation.
30        (d)      In an action arising under subsections (a) or (b) of this section, any person who has
31    delivered or sent a demand to a target in North Carolina has purposefully availed himself of the
32    privileges of conducting business in this State and shall be subject to suit in this State, whether
33    or not the person is transacting or has transacted any other business in this State. This Chapter
34    shall be construed as a special jurisdiction statute in accordance with G.S. 1-75.4(2).
35        (e)      If a party is unable to pay any amount awarded by the court pursuant to subsections
36    (a) or (b) of this section, the court may find any interested party joined pursuant to subsection
37    (c) of this section jointly and severally liable for the abusive patent assertion and make the
38    award recoverable against any or all of the joined interested parties.
39        (f)      This Chapter shall not be construed to limit rights and remedies available to the
40    State of North Carolina or to any person under any other law and shall not alter or restrict the
41    Attorney General's authority under this Chapter with regard to conduct involving assertions of
42    patent infringement."
43        **SECTION 2.** G.S. 14-118.4 reads as rewritten:
44    "**§ 14-118.4. Extortion.**
45        (a)      Any person who threatens or communicates a threat or threats to another with the
46    intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or
47    immunity is guilty of extortion and such person shall be punished as a Class F felon.
48        (b)      A person is guilty of extortion under this section when the person intentionally
49    obtains or attempts to obtain property of another by making or threatening to make an abusive
50    patent assertion under G.S. 75-139 against the other person. For purposes of this subsection, a
51    "person" means an individual, agent, company, firm, or corporation."

34

1    **SECTION 3.**  Section 1 of this act is effective when it becomes law and applies to
2    causes of actions commenced on or after that date and demands made on or after that date.
3    Section 2 of this act becomes effective December 1, 2014, and applies to offenses committed
4    on or after that date.  The remainder of this act is effective when it becomes law.



# Bill Draft 2013-MCz-214:
# Patent Abuse Bill.

*2013-2014 General Assembly*

| | | | |
|---|---|---|---|
| **Committee:** | Joint Legislative Economic Development and Global Engagement Oversight Committee | **Date:** | April 1, 2014 |
| | | **Prepared by:** | Dan Ettefagh |
| **Analysis of:** | 2013-MC-214 | | Committee Counsel |

**SUMMARY:** *This bill would create a civil and criminal cause of action against bad faith assertions of patent infringement, would require the posting of a bond sufficient to cover the litigation fees and costs of a target of an assertion in the event the court found a reasonable likelihood of a bad faith assertion of patent infringement, would empower the Attorney General to investigate and enforce the provisions relating to bad faith assertions of patent infringement, and would authorize treble damages for target who prevail in a case involving bad faith assertions of patent infringement.*

**CURRENT LAW:** Patent law is primarily governed by and preempted by federal law, which limits when a state may govern or regulate patentable subject matter. In 1999, the federal circuit held that patent law does not preempt allegations of state-law unfair competition where such requires a showing of bad faith. Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d 1340 (Fed. Cir. 1999). In 2004, the court elaborated by saying that, to survive federal preemption, the allegedly bad-faith patent assertion "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized." Globetrotter Software, Inc. v. Elan Computer Group. Inc., 362 F.3d 1367 (Fed. Cir. 2004). The objective baselessness standard is not the basis of the state court action contemplated by the bill; therefore, the legislation could be attacked on the grounds that it allows for application in instances that would result in federal preemption; the proposed statute might withstand scrutiny if it is enforced with precision only against persons asserting claims that are objectively baseless.

**BILL ANALYSIS:** Section 1 of the bill would make bad faith assertions of patent infringement an unfair and deceptive trade practice. The assertion involves communicating that patent infringement has occurred or that certain entities need to license a patent. The entities to whom the communication is made is a "target," which can be the person receiving the demand or assertion of patent infringement, a person threatened with or made the defendant of patent litigation, or a person with customers who have received a demand asserting patent infringement.

To aid the court in determining whether actions are taken in good or bad faith, the bill sets forth a number of non-exclusive factors the court can weigh. Factors indicating bad faith include:

- The demand does not contain the patent number/patent application number, name and address of patent owner/s and assignee/s, specific identification of areas of infringement, and an explanation of why the person making the assertion has standing (where they are not identified as the patent owner). An additional factor includes failing to respond to a request for this same information within a reasonable time.

- The person making the assertion did not analyze the claims in the patent to the alleged infringing device or activity.

*Kory Goldsmith*
*Director*

*Legislative Drafting*
*(919) 733-6660*



- The person making the assertion demands licensing or response within an unreasonably short period of time.
- The person making the assertion offers to license the patent for an amount unrelated to the reasonable estimate of the value of the license or bases the license fee on the cost of litigation.
- The claim of infringement is meritless and the person making the assertion knew/should have known it is meritless. Alternatively, the factor is satisfied if a claimant bases an assertion on a patent interpretation disclaimed during prosecution and knew or should have known about the disclaimer or would have known upon review of prosecution history.
- The assertion is deceptive.
- The person making the assertion has previously/concurrently filed/threatened to file other lawsuits based on the same/similar claim of patent infringement without the information required above or there has been a previous attempt to enforce the claim where the claim was found to be meritless.
- The person making the assertion has made substantially the same claim against multiple recipients against a wide variety of products without reflecting the differences in a reasonable manner in the various demands.
- The person making the assertion identifies but does not disclose any post-grand finding of invalidity or unpatentability involving the patent.
- The person making the assertion seeks an injunction that is objectively unreasonably under the law.
- Any other factor the court finds relevant.

Factors indicating good faith on the part of the person making the assertion:

- The demand contains the information described above or timely responds with the information upon demand.
- The person engages in a good faith effort to establish the target has infringed the patent and to negotiate an appropriate remedy.
- The person substantially invests in the use of the patent, which involves active practice and not licensing alone.
- The person is (i) the inventor/joint inventor or the original assignee or (ii) an institution of higher education/a technology transfer organization owned/affiliated with an institution of higher education.
- The person has demonstrated good faith business practices in previous efforts to enforce the patent/substantially similar patent or has successfully enforced the patent/substantially similar patent.
- Any other factor the court finds relevant.

Specifically exempted from the purview of the new statute are assertions of patent infringement concerning drugs and biological products regulated under the Food, Drug, and Cosmetic Act.

If the court determines there is a reasonable likelihood of bad faith patent assertion, the court must require the person making the assertion to post a bond estimated to equal the costs and fees to litigate the

claim and the amount likely to be recovered by the target due to the state claim created by the act. An exception to the bond mandate occurs where the person asserting the claim has assets equal to the amount of the proposed bond or good cause exists. The bond would be conditioned on a determination of an amount being finally determined to be due to the target and is capped at $500,000. The bond does not insulate the person making a bad faith assertion from liability above the bond amount.

Other provisions of the civil cause of action include:

- The Attorney General is empowered to make rules, conduct investigations, bring civil actions, or enter assurances of discontinuance provided in Chapter 75 of the General Statutes.

- Damages authorized to be awarded to a target include equitable relief, damages, costs and fees, and exemplary damages equal to the greater of $50,000 or three times the total of damages, costs, and fees.

- The court is permitted to join interested parties if the person asserting infringement has no substantial interest in the patent other than the assertion. Joined parties may be held jointly and severally liable if the party making the assertion is unable to pay amounts awarded.

- Making a demand to a North Carolina target subjects the person to the jurisdiction of North Carolina courts.

Section 2 of the bill would enlarge the criminal offence of extortion to include intentionally obtaining or attempting to obtain property by making or threatening an abusive patent assertion under G.S. 75-139. Extortion is a class F felony.

**EFFECTIVE DATE:** Section 1 of the bill creating the civil cause of action is effective when it becomes law and applies to causes of actions commenced on or after that date and demands made on or after that date. Section 2 of the bill enlarging the criminal offense of extortion becomes effective December 1, 2014, and applies to offenses committed on or after that date.

**BACKGROUND:** According to recent studies, people or companies that misuse patents as a business strategy ("patent trolling") has jumped by nearly 250%, rising from 29% of infringement suits to 62% of infringement suits in 2 years. As a result, the federal government has taken, is taking, or is contemplating the following courses of action:

- The DOJ Antitrust Division and FTC are jointly working towards modifying modern patent law to account for trolling practices. The FTC is actively investigating trolling activity and has stated its intention to use statutory authority, such as Section 5 of the FTC Act to prevent unfair and deceptive acts such as those typically employed by patent trolls.

- There have been federal legislation proposals that range from disclosure/transparency requirements to filing of written offers to settle + payment of offeror's costs/expenses where the ultimate result is less favorable than the offer).

- The President has ordered the PTO to adopt rules requiring patent applicants and owners involved in PTO proceedings to disclose real-party-in-interest information and creating a national, searchable database of patent infringement letters coupled with enabling the PTO or the district courts to impose sanctions for non-compliance.

- The AIA modified the patent system to allow for challenging business method patents via inter partes review, which replaced the old reexamination process, in order to be speedier.

# APPENDIX A

---

## AUTHORIZING LEGISLATION
## ARTICLE 12O OF CHAPTER 120
## OF THE
## GENERAL STATUTES

## ALL MATERIALS DISTRIBUTED AT MEETINGS MAY BE VIEWED ON THE COMMITTEE'S WEBSITE:
## http://ncleg.net/gascripts/Committees/Committees.asp

ARTICLE 12O.

Joint Legislative Economic Development and Global Engagement Oversight Committee.

**§ 120-70.130. Creation and membership of Joint Legislative Economic Development and Global Engagement Oversight Committee.**

The Joint Legislative Economic Development and Global Engagement Oversight Committee is established. The Committee consists of 22 members as follows:

    (1)    Eleven members of the Senate appointed by the President Pro Tempore of the Senate, at least three of whom are members of the minority party; and

    (2)    Eleven members of the House of Representatives appointed by the Speaker of the House of Representatives, at least three of whom are members of the minority party.

Terms on the Committee are for two years and begin on the convening of the General Assembly in each odd-numbered year, except the terms of the initial members, which begin on appointment and end on the day of the convening of the 2007 General Assembly. Members may complete a term of service on the Committee even if they do not seek reelection or are not reelected to the General Assembly, but resignation or removal from service in the General Assembly constitutes resignation or removal from service on the Committee.

A member continues to serve until a successor is appointed. A vacancy shall be filled by the officer who made the original appointment. (2005-241, s. 7; 2011-291, s. 1.10(a); 2011-292, s. 1.)

**§ 120-70.131. Purpose and powers of Committee.**

    (a)    The Joint Legislative Economic Development and Global Engagement Oversight Committee shall examine, on a continuing basis, economic development and global engagement issues and strategies in North Carolina in order to make ongoing recommendations to the General Assembly on ways to promote cost-effective economic development initiatives, economic growth, and stimulating job creation in the global economy. In this examination, the Committee may:

    (1)    Study the budgets, programs, and policies of the Department of Commerce, the North Carolina Partnership for Economic Development, and other State, regional, and local entities involved in economic development.

    (2)    Analyze legislation from other states regarding economic development.

    (3)    Analyze proposals produced by the Economic Development Board.

    (3a)    Request the Department of Commerce to provide an annual report by January 15 of each year on the effectiveness of the following economic development programs:

        a.    Job Development Investment Grant Program (JDIG).

       b.       One North Carolina.

       c.       Article 3J Credits.

       d.       Job Maintenance and Capital Development Fund (JMAC).

(4)     Analyze North Carolina's current international activity in the business, State government, and education sectors.

(5)     Analyze barriers to international trade that may be addressed by legislation.

(6)     Explore ways to increase coordination, synchronization, and intercommunication between State and local governmental entities.

(7)     Collect and analyze data on global business trends.

(8)     Study foreign representation opportunities for North Carolina that could solicit, target, educate, and recruit international businesses to North Carolina.

(9)     Analyze incentives designed to encourage small businesses to export goods and service solutions.

(10)   Study methods for positioning North Carolina as a portal to North America for international trade.

(11)   Explore opportunities to increase foreign direct investment in North Carolina.

(12)   Study any other matters that the Committee considers necessary to fulfill its mandate.

(b)    The Committee may make interim reports to the General Assembly on matters for which it may report to a regular session of the General Assembly. A report to the General Assembly may contain any legislation needed to implement a recommendation of the Committee. (2005-241, s. 7; 2011-291, s. 1.10(b); 2011-292, s. 1.)

## § 120-70.132. Organization of Committee.

(a)    The President Pro Tempore of the Senate and the Speaker of the House of Representatives shall each designate a cochair of the Joint Legislative Economic Development and Global Engagement Oversight Committee. The Committee shall meet upon the joint call of the cochairs.

(b)    A quorum of the Committee is seven members. Only recommendations, including proposed legislation, receiving at least six affirmative votes may be included in a Committee report to the General Assembly. While in the discharge of its official duties, the Committee has the powers of a joint committee under G.S. 120-19 and G.S. 120-19.1 through G.S. 120-19.4.

(c)    The cochairs of the Committee may call upon other knowledgeable persons or experts to assist the Committee in its work.

(d)    Members of the Committee shall receive subsistence and travel expenses as provided in G.S. 120-3.1, 138-5, or 138-6, as appropriate. The Committee may contract for consultants or hire employees in accordance with G.S. 120-32.02. The Legislative

Services Commission, through the Legislative Services Officer, shall assign professional staff to assist the Committee in its work. Upon the direction of the Legislative Services Commission, the Supervisors of Clerks ofthe Senate and of the House of Representatives shall assign clerical staff to the Committee. The expenses for clerical employees shall be borne by the Committee. (2005-241, s. 7; 2011-292, s. 1.)

# APPENDIX B

## MEETING AGENDAS

**ALL MATERIALS DISTRIBUTED AT MEETINGS MAY BE VIEWED ON THE COMMITTEE'S WEBSITE:**
http://ncleg.net/gascripts/Committees/Committees.asp

# AGENDA
## JOINT LEGISLATIVE ECONOMIC DEVELOPMENT &
## GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE

*Sen. Harry Brown*             *Rep. Tom Murry*

**Thursday, October 3, 2013**
**Room 643, Legislative Office Building**
**10:00 a.m.**

I.     **Call to Order**
*Rep. Murry*

II.    **Welcome and Introductions**

III.   **Recent Committee Efforts and**
**2013 Session Actions impacting Dept. of Commerce**
*Aubrey Incorvaia, Fiscal Research Division*

IV.   **Commerce Updates**

- **Focus: Economic Development Partnership of North Carolina, Inc.**
  *Secretary Sharon Decker, Department of Commerce*

- **Focus: Rural Economic Development Division**
  *Assistant Secretary Dr. Patricia Mitchell, Rural Economic Development Division, Department of Commerce*

V.     **Adjournment**

**Next Meeting Date: Thursday, November 7, 2013**
**in Room 643, LOB, at 10:00 a.m.**

# AGENDA
## JOINT LEGISLATIVE ECONOMIC DEVELOPMENT & GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE

**Sen. Harry Brown**          **Rep. Tom Murry**

### Thursday, November 7, 2013
### Room 643, Legislative Office Building
### 10:00 a.m.

I. **Call to Order**
   Sen. Brown

II. **Approval of Minutes from October 3, 2013 Meeting**

III. **North Carolina's Competitive Outlook**
   *Ted Abernathy, Managing Partner, Economic Leadership LLC*

IV. **Flood Insurance Update**
   *Tom Thompson, Chair, NC-20*

V. **Commerce Updates**

   - **Economic Development Partnership of North Carolina, Inc.**
     *Secretary Sharon Decker, Department of Commerce*

   - **Rural Economic Development Division**
     *Assistant Secretary Dr. Patricia Mitchell, Rural Economic Development Division, Department of Commerce*

VI. **Commerce Strategic Planning**
   *Tony Almeida, Sr. Advisor to Gov. McCrory on Jobs and the Economy*

VII. **Adjournment**

### Next Meeting Date: Thursday, December 5, 2013
### in Room 643, LOB, at 10:00 a.m.

# AGENDA
## JOINT LEGISLATIVE ECONOMIC DEVELOPMENT & GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE

### *Sen. Harry Brown*            *Rep. Tom Murry*

---

*Thursday, December 5, 2013*
*Room 643, Legislative Office Building*
*10:00 a.m.*

I. **Call to Order**
   Sen. Brown

II. **Approval of Minutes from November 7, 2013 Meeting**

III. **Targeting Job Creation in Areas with High Unemployment**
   - *Labor Market Conditions*
     *Jackie Keener, Labor & Economic Analysis Division, Department of Commerce*
   - *Rural Economic Development*
     *Assistant Secretary Dr. Patricia Mitchell, Rural Economic Development Division, Department of Commerce*
   - *Incentives in Context*
     *Patrick McHugh, Fiscal Research Division*
   - *North Carolina Community College System Strategic Plan Overview and Examples of Success in Distressed Areas*
     - Overview of Customized Training and NC Back-to-Work:
       *Maureen Little, Associate Vice President, Customized Training Program, North Carolina Community College System*
     - Preparing the Workforce of the Future:
       *Dr. Bud Merchant, President, Central Carolina Community College*
     - Retraining Today's Workforce:
       *Dr. Steve Thornburg, President, Cleveland Community College*

IV. **Commerce Updates**
   - **Rural Economic Development Division**
     *Assistant Secretary Dr. Patricia Mitchell, Rural Economic Development Division, Department of Commerce*
   - **Economic Development Partnership of North Carolina, Inc.**
     *Tony Almeida, Sr. Advisor to Gov. McCrory on Jobs and the Economy*

V. **Adjournment**

**Next Meeting Date: Thursday, February 6, 2013**
**In Room 643, LOB, at 10:00 a.m.**

# AGENDA
## JOINT LEGISLATIVE ECONOMIC DEVELOPMENT & GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE

*Sen. Harry Brown*                    *Rep. Tom Murry*

*Thursday, February 6, 2014*
*Room 643, Legislative Office Building*
*10:00 a.m.*

I. **Call to Order**
Sen. Brown/ Rep. Murry

II. **Approval of Minutes from December 5, 2013 Meeting**

III. **Commerce Economic Development Partnership of North Carolina, Inc.**
- **Commerce Plans Submitted to OSBM**
  *Aubrey Incorvaia, FRD*
- **S127**
  *Dan Ettefagh, Bill Drafting*
- **Public Private Partnerships: Best Practices**
  *Patrick McHugh, FRD*
- **Progress Update on EDP**
  *Secretary Sharon Decker, Department of Commerce*
  *Richard Lindenmuth, EDP Interim CEO*

IV. **Commerce Updates**

- **Economic Development Board – Strategic Plan Update and Path Forward**
  *John Lassiter, Board Chair*
- **Rural Economic Development Division**
  *Assistant Secretary Dr. Patricia Mitchell, Rural Economic Development Division, Department of Commerce*

V. **Adjournment**

**Next Meeting Date: Thursday, March 6, 2014**
**in Room 643, LOB, at 10:00 a.m.**

# AGENDA
## JOINT LEGISLATIVE ECONOMIC DEVELOPMENT & GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE

### *Sen. Harry Brown*          *Rep. Tom Murry*

**Thursday, March 6, 2014**
**Room 643, Legislative Office Building**
**10:00 a.m.**

**I.   Call to Order**
Sen. Brown/ Rep. Murry

**II.  Approval of Minutes from February 6, 2013 Meeting**

**III. Innovation**

- *North Carolina Innovation Index* and *National Network for Manufacturing Innovation Grant Program* (20 minutes + questions)
  *Dr. John Hardin, Executive Director, Office of Science & Technology, Department of Commerce*
- **UNC Research & Commercialization**
  (20 minutes + questions)
  *Dr. Chris Brown, Vice President for Research and Graduate Education, UNC General Administration*
- **REACH NC: Research, Engagement & Capabilities Hub of NC**
  (20 minutes + questions)
  Sharlini Sankaran, Executive Director, REACH NC
- *Business Perspective on NC's Role in Supporting Innovation*
  (20 minutes total + questions)
  *Joe Carr, Chief Executive Officer, Semprius*
  *Lee Clark Sellers, Innovation Officer, Ply Gem Industries*

**IV.  Commerce Updates**

- **Economic Development Partnership of North Carolina, Inc.**
  *Richard Lindenmuth, Department of Commerce*
- **Rural Economic Development Division**
  *Assistant Secretary Dr. Patricia Mitchell, Rural Economic Development Division, Department of Commerce*

**V.   Adjournment**

**Next Meeting Date: April 10, 2014 (Note date change)**
**in Room 643, LOB, at 10:00 a.m.**

48

<u>AGENDA</u>
JOINT LEGISLATIVE ECONOMIC DEVELOPMENT &
GLOBAL ENGAGEMENT OVERSIGHT COMMITTEE

*Sen. Harry Brown*                    *Rep. Tom Murry*

*Thursday, April 3, 2014*
*Room 643, Legislative Office Building*
*10:00 a.m.*

I.   **Call to Order**
     Rep. Murry

II.  **Approval of Minutes from March 6, 2014 Meeting**

III. **Bill Draft: Modified S127**

IV.  **Bill Draft: Abusive Patent Practice Legislation**
     John Boswell, SAS Senior Vice President and Chief Legal Officer

V.   **Report to the 2014 General Assembly**

VI.  **New Markets Jobs Act**

VII. **Commerce Updates**

     • **Economic Development Partnership of North Carolina, Inc.**
       *Secretary Decker and/or Richard Lindenmuth, Department of*
       *Commerce*
     • **Rural Economic Development Division**
       *Assistant Secretary Dr. Patricia Mitchell, Rural Economic*
       *Development Division, Department of Commerce*

VIII. **Adjournment**

49